* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the compensable December 23, 2003 injury by accident, Allied Claims Administration was the servicing-agent of New Hanover Regional Medical Center's self-insured workers' compensation insurance.
3. At the time of the compensable December 23, 2003 injury by accident, employee-plaintiff was an employee of New Hanover Regional Medical Center.
4. Defendants accepted compensability for employee-plaintiff's low back injury on a Form 60, filed with the North Carolina Industrial Commission on June 21, 2004.
5. Employee-plaintiff was out of work and received indemnity benefits from June 7, 2004 through October 17, 2004.
6. Employee-plaintiff has been working modified duty for New Hanover Regional Medical Center since October 18, 2004.
7. Defendants have paid all medical expenses and indemnity benefits related to employee-plaintiff's compensable back injury.
8. Defendants have not paid for medical expenses related to employee-plaintiff's right hip condition, which has been denied.
In addition, the parties stipulated into evidence the following:
1. An indexed packet of documents consisting of 248 pages which included Industrial Commission forms, an injury report, the Social Security award, the employee health file, the personnel file and discovery responses.
2. Packet of medical records and reports submitted after the hearing.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was fifty-seven years old at the time of hearing before the Deputy Commissioner, and a high school graduate, began working in the housekeeping department of defendant hospital in November 1994. After working in that position for a couple of years, she was promoted to the position of operating room assistant, and she held that job until the injury in question occurred. As an operating room assistant, her duties included gathering listed equipment for the operations scheduled, transporting patients to the operating room, pulling them onto and off of the operating table and, after the patient had been taken out of the room, cleaning the operating room by removing the trash and the linens, mopping the floor and cleaning the operating table.
2. On December 23, 2003 plaintiff sustained a compensable injury by accident at work when she slipped while mopping a recently waxed floor in the operating room. Although she did not fall to the floor, she twisted her back trying to keep from falling. By the next day, she developed severe back and right leg pain. On December 29, 2003 she reported the injury and was sent to Employee Health Services, where she was referred to Dr. Foster, an orthopedic surgeon.
3. Dr. Foster had just recently released plaintiff from his care after a fall at work in July 2003. Plaintiff had complained of back pain and left buttock and leg pain following that fall, and Dr. Foster had treated her for a compression fracture of L1. Plaintiff's condition improved with conservative treatment and work restrictions. Dr. Foster released her to return to her regular job on December 3, 2003 when he discharged her from his care.
4. Plaintiff returned to Dr. Foster on January 7, 2004, after the injury in question. On that occasion, she told him that sitting aggravated her upper back and that standing aggravated her right hip. He diagnosed her with lumbar sprain/strain and treated her with medication and physical therapy. He also kept her on the light-duty work restrictions she had been given by Employee Health. However, on January 21, 2004 he released her to return to her regular job and advised her that he had no further treatment to offer her.
5. Due to persistent symptoms, plaintiff went to her family doctor, Dr. Hines, on February 18, 2004 and described to him persistent problems with low back pain which was radiating to her left leg at that time. Dr. Hines ordered an MRI, which revealed disc herniations at L4-5 and L5-S1. He then referred her to Dr. Brown, a neurosurgeon whom plaintiff had seen in 2002 for back problems. Dr. Brown evaluated her on March 11, 2004 and recommended further conservative treatment with medication, physical therapy and work restrictions. Her condition initially improved with that treatment, but by May 6, 2004 she was complaining of significantly worse pain in her back and down both legs. Consequently, Dr. Brown recommended surgery.
6. On June 9, 2004 Dr. Brown operated to decompress the L4-5 and L5-S1 interspaces in plaintiff's back. Plaintiff did well for a month following the surgery, but she then developed back and right leg pain after walking at the mall, as the doctor had instructed her. By August she was complaining of pain in her left leg, as well, so Dr. Brown ordered another MRI. The test revealed that scar tissue had developed at the site of the surgery and that she had fairly significant degenerative disc disease at L4-5. However, there was no recurrent disc herniation.
7. Dr. Brown ordered pool therapy and then allowed plaintiff to return to work on a part-time basis. Her symptoms persisted. Although she did return to work, she had difficulty doing her job. The doctor then referred her to Dr. Grieb, a pain management specialist, for injection therapy. Dr. Grieb examined her on December 7, 2004 and reviewed her MRI. He diagnosed her with L4-5 central and forminal stenosis and possible facet arthropathy. He recommended a series of injections, both for diagnostic and therapeutic purposes. During the next two months, he performed an epidural steroid injection and two nerve root sleeve injections, but none of the injections provided what he considered to be significant relief. Consequently, on February 17, 2005 he referred her back to Dr. Brown for a surgical opinion.
8. Dr. Brown had previously discussed with plaintiff the next surgical option, which would involve a fusion. His physician's assistant discussed the options further with her on March 8, 2005. Upon reflecting on the information provided, plaintiff chose not to have fusion surgery at that time. Consequently, a functional capacity evaluation was ordered and she remained under the care of Dr. Grieb for pain management.
9. Plaintiff returned to Dr. Grieb on March 18, 2005 with complaints of burning dysesthesia in her low back, right hip and right thigh. He treated her with medication on that date. At her next appointment on May 2, she was limping and complaining of worsening right thigh and calf pain. The doctor had recently been studying about how hip pain could radiate to the back and, since plaintiff had not responded well to treatments addressing back problems, he decided to inject her right hip for diagnostic purposes. Following that injection, plaintiff experienced significant improvement in her pain and mobility for two weeks. Consequently, it appeared that her hip might be causing at least some of her symptoms. Dr. Grieb then referred her to Dr. Sutton, an orthopedic surgeon, for evaluation of her right hip joint.
10. Dr. Sutton examined plaintiff on August 26, 2005. There were no findings suggesting radicular pain, and x-rays of her hip were not diagnostic. He ordered an MRI arthrogram of her right hip and an intra-articular injection. The test results proved to be within normal limits and plaintiff did not obtain pain relief from the injection. Consequently, Dr. Sutton found no objective evidence of a hip problem.
11. Dr. Grieb was surprised at the results of the hip work-up in view of plaintiff's positive reaction to the injection he had given her, and he recommended that she get a second opinion regarding whether she had a problem with her right hip. However, regardless of whether she had hip pathology, he believed that she did have back problems which were causing symptoms and he continued to treat the back problems.
12. Dr. Brown saw plaintiff once more in October 2005 after the work-up of her hip had been completed. She was continuing to complain of back and right leg pain which went to her groin and thigh. With the test findings, Dr. Brown did not believe that her hip joint was symptomatic but was of the opinion that her symptoms were coming from her back. He gave her permanent work restrictions for six hours per day, three days per week with no lifting more than twenty pounds occasionally, with no regular bending or stooping and with frequent changes in position. Since she had elected to not have further surgery, he had previously released her at maximum medical improvement from a neurosurgical standpoint. However, he advised her to follow up with Dr. Grieb for pain management.
13. Dr. Grieb continued to see plaintiff until his testimony was taken. He did not administer further injections to her hip but treated her for her back conditions, even though he continued to suspect that there was an occult hip condition which had not been demonstrated by diagnostic testing.
14. Plaintiff requested this hearing because defendants refused to authorize the work-up and treatment for her right hip. Although defendants admitted liability for a low back injury pursuant to the Form 60 filed in this claim, they denied that plaintiff had injured her right hip when she slipped on December 23, 2003.
15. When Dr. Grieb performed the hip injection on May 13, 2005, the injection was primarily for diagnostic purposes, since he did not believe that the source of her pain had truly been identified in view of her minimal response to the injections to her back. When she responded so well to the hip injection, it was reasonable for him to order a complete work-up to evaluate the hip joint since hip problems have been documented to cause buttock pain and pain in other areas normally associated with a back problem. Furthermore, the medical reports of Dr. Foster documented that plaintiff had had right hip pain the first time she saw him approximately two weeks after she slipped at work on December 23, 2003.
16. The evaluation by Dr. Sutton and the testing he ordered was reasonably necessary to diagnose the source of the symptoms plaintiff was experiencing due to her injury at work. The work-up tended to effect a cure, even though it ultimately proved to be negative.
17. Despite Dr. Grieb's strong suspicion that, in addition to her back problems, plaintiff had sustained a hip condition due to her injury at work, plaintiff has not been able to prove that she has sustained an injury to her hip since the work-up for her hip was negative. Consequently, as of the time the doctors were deposed, the evidence did not establish that she had sustained a hip injury or that she required treatment for a hip condition.
18. At the time of the injury in question, plaintiff's average weekly wage was $400.26 according to the Form 22 wage chart submitted by defendants. However, during the year before the injury, she was on light-duty for several months due to a prior injury at work. The evidence did not disclose whether her earnings were reduced as a result of those work restrictions. Consequently, a specific finding as to average weekly wage is not made in this decision.
19. As of the date of hearing, plaintiff had not been able to return to full time employment with defendant-employer and was therefore experiencing reduced earnings. It appeared from the stipulations that defendants were continuing to pay compensation to her for partial disability. Although Dr. Brown had found that she had reached maximum medical improvement from a neurosurgical standpoint, since she did not want to undergo a fusion, Dr. Grieb never addressed the issue and he was her treating physician after Dr. Brown released her. Consequently, the record was not clear regarding whether plaintiff had reached maximum medical improvement with respect to the injury in question. Furthermore, she had not made an election of remedies and had not requested a decision regarding permanent disability. Consequently, no findings are made regarding that issue.
20. Defendants had reasonable grounds to support their defense of this claim. Plaintiff has specifically requested that attorney's fees be assessed against defendants for the time they wasted during depositions for questions regarding issues not raised by the parties in the Pre-Trial Agreement. However, there was a legitimate issue regarding the hip condition raised by the parties, so no finding can be made that the case as a whole was defended without reasonable grounds.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. In that Dr. Grieb had good reason to believe that the symptoms plaintiff was experiencing as a result of her December 23, 2003 injury by accident were coming from a hip condition, the hip work-up he ordered, which was performed by Dr. Sutton, reasonably tended to effect a cure for the injury giving rise to this claim. Consequently, plaintiff is entitled to have defendants pay for such diagnostic work-up, to include MRI, injections, and arthrograms as necessary for diagnosis. N.C. Gen. Stat. §§ 97-2 (19); 97-25.
2. However, plaintiff is not entitled to have defendants provide further treatment for her right hip joint, which has not been shown to have been injured due to the injury by accident in question as of the date the medical depositions were completed. N.C. Gen. Stat. §§ 97-2
(19); 97-25; Click v. Pilot Freight Carriers, Inc., 300 N.C. 164 (1980).
3. As of the date of hearing, plaintiff was entitled to receive continuing compensation for partial disability. N.C. Gen. Stat. § 97-30.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, except for the alleged hip injury as explained above. N.C. Gen. Stat. §§ 97-2(19);97-25,
5. Plaintiff is not entitled have attorney's fees assessed against defendants in that the claim was defended with reasonable grounds. N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay for the diagnostic work-up of plaintiff's right hip ordered by Dr. Grieb and performed by Dr. Sutton, to include MRI, injections, and arthrograms as necessary for diagnosis. However, they are not at this time liable for treatment for the hip joint, which has not been shown to have been injured as a result of the accident.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, except for additional treatment for the right hip joint.
3. An attorney's fee in the amount of twenty-five percent of the ongoing compensation being paid to plaintiff is approved for her attorney. Defendants shall pay every fourth check to Mr. King.
4. Defendants shall pay the costs.
This 15th day of December 2006.
S/________________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/________________________ BERNADINE S. BALLANCE COMMISSIONER
 S/________________________ THOMAS J. BOLCH COMMISSIONER